IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs April 18, 2018

## THOMAS F. GREENWOOD v. STATE OF TENNESSEE

**Appeal from the Circuit Court for Coffee County**
**No. 42931    L. Craig Johnson, Judge**

_____

### No. M2017-01314-CCA-R3-PC

_____

The Petitioner, Thomas F. Greenwood, appeals the post-conviction court's denial of his petition for post-conviction relief in which he challenged his convictions of felony murder during the perpetration of aggravated child neglect, reckless homicide, aggravated child abuse, and aggravated child neglect.  On appeal, the Petitioner contends that trial counsel was ineffective by failing to retain an expert, present certain witnesses, and properly prepare the Petitioner for trial.  Upon reviewing the record and the applicable law, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and CAMILLE R. MCMULLEN, JJ., joined.

John Nicoll, District Public Defender, and Trenena G. Stanley, Assistant District Public Defender, for the appellant, Thomas F. Greenwood.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Counsel; Craig Northcott, District Attorney General; and Jason Ponder, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION

### FACTUAL AND PROCEDURAL HISTORY

#### Trial

The evidence presented at trial established that on March 9, 2010, the two-year-old victim died while in the care of the Petitioner, who was the boyfriend of the victim's mother.  The facts relevant to this post-conviction appeal are summarized below; a

complete recitation of the evidence presented at trial is included in this court's opinion on direct appeal. *See State v. Thomas Fancher Greenwood*, No. M2013-01924-CCA-R3-CD, 2014 WL 6609308, at *1-21 (Tenn. Crim. App. Nov. 21, 2014), *perm. app. denied* (Tenn. Apr. 10, 2015).

The victim's mother testified that the victim, who was born two months prematurely, suffered from asthma and would frequently require breathing treatments when he was a baby. *Id.* at *1. In the two and one-half months prior to his death, the victim's breathing had improved, and he suffered no asthma attacks. *Id.* at *2. In February 2010, the victim's mother became reacquainted with the Petitioner, and at the beginning of March, the Petitioner moved in with the victim's mother temporarily. *Id.* The victim's mother was aware that the Petitioner had epilepsy and that he had once suffered a short, two-to-three-second seizure while he was staying with her, causing him to twitch and drop the telephone he was holding in his hand, but the victim's mother testified that the Petitioner took anti-seizure medication each morning. *Id.*

On March 9, 2010, the Petitioner volunteered to watch the victim while her mother testified at the custody hearing of the victim's aunt. *Id.* Due to the victim's sleep schedule and her mother's expectation of being the first to testify, the victim's mother anticipated that the Petitioner would only be required to watch the victim for approximately "thirty 'waking' minutes." *Id.* Before leaving her residence, the victim's mother checked on the sleeping victim to ensure that his breathing was fine and departed for the courthouse at 7:30 a.m. *Id.*

During the 10:00 hour, the victim's mother retrieved her telephone to check on the victim. *Id.* In communicating about the condition of the victim, the Petitioner informed the victim's mother that the Petitioner had a seizure while holding the victim and that the Petitioner had dropped the victim, bumping the victim's head in the process. *Id.* When the victim's mother asked if the victim was stumbling, the Petitioner replied that the victim was fine and was playing in his room. *Id.* After the court adjourned for lunch, the victim's mother called and asked to speak with the victim, but the Petitioner told her that they had been playing outside and that the victim was then asleep. *Id.* at *3. The Petitioner tried to call the mother while she was in court. *Id.* When she returned his call, she learned that the victim had experienced an asthma attack and was in an ambulance. *Id.* When the victim's mother arrived at the emergency room, the Petitioner said, "I hope they do not get me for child neglect." *Id.* She then learned that the victim had passed, and emergency room personnel allowed her to see the victim. *Id.* At trial, the victim's mother reviewed pictures of the victim and testified that prior to leaving the victim in the Petitioner's care, the victim had none of the injuries depicted except for a small pink mark on his head from where he had previously bumped it. *Id.*

Mr. Derrick Watson, the responding paramedic, testified that the Petitioner "met him at the door holding the victim, whom Mr. Watson described as 'limp, pulseless, and apneic, which means not breathing.'" *Id.* at *4. After the Petitioner advised Mr. Watson of the victim's asthma, Mr. Watson and his partner attempted all life-saving methods on the victim, but the victim "had no blood pressure, no pulse, and no respirations." *Id.* The paramedics transported the victim to the hospital and placed him in a hospital bed. *Id.* Mr. Watson testified that the victim had bruising around his neck, above one eye, in the abdominal area, and along the spinal column. *Id.* Mr. Watson was "'100% positive'" that the resuscitative efforts had not caused any of the victim's injuries, and he testified that he had contacted the police because he "'suspected some type of abuse.'" *Id.*

Tullahoma Police Department Officer Matthew Walker testified that when he responded to the 9-1-1 call, the Petitioner told him that "he had suffered a seizure and dropped the victim, causing the victim to strike his head on a bed rail." *Id.* When the victim showed signs of respiratory distress, the Petitioner attempted to use the victim's nebulizer to assist him before calling 9-1-1. *Id.* Officer Walked testified that the Petitioner was "'very calm.'" *Id.* When Officer Walker arrived at the hospital, he learned that the victim had died, and he saw "'multiple marks'" all over the victim's body. *Id.* at *5.

Ms. Amy Vickers, a registered nurse at the Harton Regional Medical Center, testified that the victim "had multiple bruises and was unresponsive" when he arrived at the hospital and that the victim was pronounced dead at 3:17 p.m. *Id.* Ms. Vickers testified that the Petitioner described the events of that day in a "'flat and non[-]emotional'" tone of voice. *Id.* Ms. Vickers also "identified photographs of the victim depicting the various injuries on his body, including scratches about his face, bruising around his right eye, an abrasion on his chin, abrasions and scratches on the back of his neck, and bruising around his neck." *Id.*

Tullahoma Police Department Detective Dale Stone interviewed the Petitioner later that day. *Id.* at *6. After reading the Petitioner his rights, the Petitioner gave Detective Stone his version of events:

> [The Petitioner] reported that [the victim's mother] left the house at 9:30 a.m. He awoke at 10:00 a.m. and woke up the victim. He took a shower and gave the victim a bath. Around noon, they went outside to play. The victim was playing and kicking a football when he began to cough. They went inside. Thirty to forty-five minutes later, around 1:00 p.m., the victim began to cough more, and [the Petitioner] administered a breathing treatment with the nebulizer. The victim turned

- 3 -

"light blue," so [the Petitioner] called 9-1-1. He used a suction instrument to remove mucus from the victim's nose and throat. The victim stopped breathing, so [the Petitioner] called 9-1-1 again, and the ambulance arrived shortly thereafter. Detective Stone asked [the Petitioner] if that was everything, and [the Petitioner] said that it was.

Because [the Petitioner's] initial recitation of the events did not include his having a seizure, Detective Stone asked [the Petitioner] to elaborate on that point. [The Petitioner] added that approximately fifteen minutes before he administered the breathing treatment to the victim, he experienced a seizure while holding the victim and that when he fell, the victim struck his head on the side of the bed rail. When [the Petitioner] regained consciousness, the victim was beside the bed crying, and [the Petitioner] noticed that the victim had a "busted" lip, so he used a pants leg to wipe off the blood. He also applied a cold compress to a cut on the back of the victim's head. He reported that the victim said, "'Cold, cold,'" when he did so. [The Petitioner] told Detective Stone that at 12:17 p.m., he recorded a video of the victim after the fall because he believed that he "wasn't acting right" and wanted to show it to [the victim's mother]. He showed the video to Detective Stone and gave him permission to make a copy of it. Detective Stone said that the video showed that the victim was in distress but that he had no visible injuries at that time. Detective Stone said that [the Petitioner] reported that he had failed to take his Depakote that morning and that he had experienced seizures since he was ten or eleven years old.

*Id.*

In response to photographs of the victim's injuries, the Petitioner explained that the victim had sustained the laceration to the back of the head, the busted lip, and a small bruise on his back from the fall and that the large and other small bruises on the victim's back could have occurred when the Petitioner "'swung [the victim] around'" while they were playing outside. *Id.* at 7. The Petitioner attributed the cut on the victim's chin to a fall on the deck and the fingerprints on the victim's neck to the Petitioner's grip during the seizure. *Id.* The Petitioner claimed that the victim's black eye was due "to an injury on a prior occasion." *Id.* The Petitioner admitted that, following the victim's biting

- 4 -

incident, he had "bit[ten] him back on the leg and the arm to 'teach him a lesson' and then spanked him." *Id.* The Petitioner had "no explanation for the injuries that were obviously sustained after the 12:17 p.m. video that was allegedly recorded after the fall," which showed "no visible injuries at that time." *Id.* Detective Stone testified that the Petitioner's first 9-1-1 call was placed at 2:32 p.m. *Id.*

Dr. Clifford Seyler, who testified as an expert in the field of pediatrics, treated the victim upon his arrival at the hospital. *Id.* at *9. Because Dr. Seyler could not detect a heartbeat or breathing, he ordered CPR to be administered. *Id.* Resuscitative efforts were continued for twenty to twenty-five minutes, and when the victim did not respond, Dr. Seyler pronounced him deceased. *Id.* Dr. Seyler's preliminary diagnosis of the victim's injuries and death was child abuse because he was unable to obtain a "satisfactory answer" regarding the multiple bruises and abrasions observed on the victim. *Id.*

Dr. Seyler described the stages and symptoms of an asthma attack and opined that the victim was not suffering from such an attack during the video recorded by the Petitioner. *Id.* at *10. Dr. Seyler stated that, instead, the victim "had ataxia, which is 'the inability to move the body in a coordinated fashion' while walking or standing." *Id.* Dr. Seyler elaborated that the victim appeared "confused" and "disoriented" in the video, noting that the victim's name was called twice and that the victim failed to "turn around and reflect that he has heard that" and that the victim could "hardly stand on his own two feet." *Id.* Dr. Seyler stated that this ataxia commonly indicated a brain injury. *Id.* Dr. Seyler also opined that the bruises on the victim's body were not commonly found on children and that the hand marks on the victim's neck were "almost pathognomonic of child abuse." *Id.*

Medical Examiner Dr. Amy McMaster, who testified as an expert in the field of forensic pathology, performed the victim's autopsy. *Id.* at *11. Dr. McMaster "observed multiple blunt trauma injuries to different areas of" the victim's body and described multiple abrasions and contusions on the victim's head, face, and torso. *Id.* Dr. McMaster also described multiple, significant internal injuries. *Id.* She discovered ibuprofen in the victim's blood but testified that "it was not a level of concern." *Id.* at 12. Dr. McMaster stated that the cause of the victim's death was multiple blunt force trauma and that the mechanism of death was swelling of the brain. *Id.* She also considered asthma as a cause of death but stated that it made "'no medical or scientific sense in a child that has extensive bleeding around his brain, extensive bleeding with his internal organs, evidence of blunt trauma on the outside of the body as well, … to certify the cause of death as asthma when there are injuries to explain his death.'" *Id.* She further testified, with medical certainty, that the victim's death was not precipitated by resuscitative efforts. *Id.*

- 5 -

The Petitioner testified that on March 9, he took the victim outside to play and noticed that, after approximately thirty minutes, the victim was having difficulty breathing. *Id.* at *13. While walking into the house, the victim fell and hit his chin on the steps. *Id.* The Petitioner contacted the victim's mother, who told him to administer a breathing treatment, and while the Petitioner was locating the vials of medicine, he saw the victim drinking from a bottle of children's Motrin. *Id.* He told the victim's mother, who instructed him to watch the victim closely. *Id.* The Petitioner then recorded a video of the victim's behavior and attempted to send it to the cellular telephone of the victim's mother, but the video "was too long to transmit." *Id.*

While the Petitioner was carrying the victim to the bedroom to allow him to rest due to the ingestion of the Motrin and the asthma symptoms, the Petitioner suddenly fell toward the bed as he suffered a seizure. *Id.* at *14. When he regained consciousness, the victim was sitting on the bed and holding his head while "saying, 'Hurt, ow, hurt.'" *Id.* The Petitioner examined the victim and noticed an injury to the back of the victim's head that had been caused in the fall; the Petitioner noticed no other injuries to the victim. *Id.* He got an ice pack for the victim's head and wiped away blood from the victim's bleeding lip. *Id.*

The Petitioner noticed that the victim's breathing was more labored, and when he was unable to reach the victim's mother, he called 9-1-1. *Id.* The Petitioner attempted to perform CPR on the victim as instructed by the 9-1-1 dispatcher but the dispatcher did not tell the Petitioner "how to place his hands, how many hands or fingers to use, how hard to press, or where exactly to press on the victim's chest." *Id.*

The Petitioner denied telling the victim's mother at the hospital that "he hoped she would not 'try to get [him] for child abuse.'" *Id.* at *15. The Petitioner stated that the victim sustained his black eye on March 8 when he ran into a doorknob. *Id.* The Petitioner denied intentionally injuring the victim and testified that he did not physically abuse the victim on March 9. *Id.* On cross examination, the Petitioner testified that he grabbed the victim and shook him to keep his eyes open. *Id.* at *18.

Dr. Thomas Young testified as an expert in forensic pathology for the defense and opined that the victim's death was caused by bronchial asthma and that the manner of death was due to natural causes. *Id.* Dr. Young did not believe that the victim's brain hemorrhaging was due to a traumatic injury, and he opined that the bleeding in the brain did not cause the victim's death. *Id.* On cross-examination, the State addressed Dr. Young's "new career testifying almost exclusively for criminal defendants," as well as his "conflicts at his previous employment" and his "disagreement with the current methodology utilized in the diagnosis of child abuse." *Id.* at *19. Dr. Young testified that, in his opinion, the victim's abdominal injuries and bruising on his back was

- 6 -

consistent with the Petitioner's uneducated administration of CPR. *Id.*

Dr. McMaster testified in rebuttal and disagreed with Dr. Young's assessment of the victim's injuries having been caused by CPR, and she strongly disagreed with Dr. Young's conclusion that the victim's death was caused by asthma, reiterating that, in her opinion, the cause of death was "multiple blunt force injuries." *Id.* at *20-21.

The jury convicted the Petitioner as charged of felony murder in the perpetration of aggravated child neglect, aggravated child abuse, and aggravated child neglect and of the lesser-included offense of reckless homicide, and the Petitioner was sentenced to life imprisonment. *Id.* at *1. This court affirmed the convictions on direct appeal. *Id.* at *41. The Petitioner filed a timely post-conviction petition.

## Post-Conviction Hearing

At the post-conviction hearing, trial counsel testified that he had practiced law since 1979 and that the Petitioner's was his fifth jury trial involving a murder. Trial counsel was appointed to represent the Petitioner, and an associate from trial counsel's law office assisted him with the Petitioner's case. Trial counsel also consulted with several other attorneys during his representation of the Petitioner.

Trial counsel sought funding for a neuropsychologist, which the trial court denied, and funding for a forensic pathologist, which the trial court granted. Trial counsel was unable to present any expert proof on the issue of the Petitioner's seizures because the trial court had denied his motion for funding for a neuropsychologist and because the Petitioner was found competent to stand trial following a mental evaluation. In addition, Dr. Young was prepared to and did testify that the victim's bruises were caused by resuscitative efforts and not by the victim's fall during the Petitioner's seizure. Given the extensive bruising on the victim, as portrayed in the photographs entered into evidence at trial, trial counsel believed it would not be "reasonable to try to convince a jury that a fall with [the victim] caused all of these injuries."

Trial counsel contacted "most" of the character witnesses requested by the Petitioner, but he was unable to find any witnesses outside of the Petitioner's family who could testify that the Petitioner was not a flight risk. Trial counsel explained that "character witnesses are not necessarily admissible at the trial just as to general character" but that the defense would have needed to find a way to "tie the character witnesses to a trait that is pertinent in the case." Trial counsel was unaware of a specific trait that the potential witnesses could have addressed, and he was also concerned that any character testimony would have opened the door for the State to offer rebuttal testimony. Additionally, trial counsel learned that, aside from the Petitioner's family

members, other potential character witnesses did not wish to "become involved." Trial counsel explained all of this to the Petitioner, and although trial counsel was "not sure that [the Petitioner] ever agreed" with him, the Petitioner seemed to understand trial counsel's reasoning.

With respect to trial counsel's decision not to call witnesses at trial who had observed the Petitioner's past seizure activity, trial counsel explained that proof of the Petitioner's seizures was presented at trial and that he did not wish to change focus from the primary theory of the case, which was that the injuries were caused by resuscitation, as Dr. Young testified. Counsel added that "it wasn't contested that [the Petitioner] had the seizure" and that witness testimony regarding the Petitioner's seizures during the guilt phase of the trial "would have gone contrary . . . to what [Dr. Young] was going to testify to in this case."

Trial counsel believed that the Petitioner's character was not particularly relevant given their theory of the case and he explained that he had "been burned" by character testimony in the past. Trial counsel had a "strong suspicion that there were some other things out there [about the Petitioner] that [trial counsel] certainly didn't want to come in, and [he] didn't want to take the chance opening the door on." Trial counsel confirmed that the State made no plea offers to the Petitioner.

Regarding trial counsel's preparation for trial, counsel testified that he spent 39.95 hours with the Petitioner over the course of his pretrial and trial representation and spent a total of 724.45 hours working on the case. Trial counsel met with the Petitioner at the jail for several hours and spent four to five hours preparing for the Petitioner's trial testimony in a question-and-answer format. Trial counsel then refined his questions and spent another four to five hours with the Petitioner, reviewing "every question" and "the answer to every question" with him. Counsel also cross-examined the Petitioner "on issues that [he] knew the State was going to hammer him on." Trial counsel believed that the Petitioner understood everything they discussed and reviewed.

On cross-examination, trial counsel confirmed that he had spoken with a number of experts and had chosen Dr. Young. Trial counsel had been unable to find an expert witness who could testify that a single fall during a seizure could have caused all of the victim's injuries.

The Petitioner testified that he was currently in the prison's mental health facility and that he had suffered "three or four seizures" while incarcerated. The Petitioner wanted his own physician to testify about his seizures, but trial counsel advised that "it would be unnecessary." When the Petitioner would disagree with counsel's trial strategy,

trial counsel would instruct the Petitioner that it would be in his "best interest" to follow counsel's advice.

The Petitioner asked trial counsel to call character witnesses to testify at trial about the Petitioner's propensity for non-violence, but counsel told the Petitioner that his character was "flawed." The Petitioner believed that the outcome of his trial might have differed if trial counsel had called witnesses to testify about his character and history of seizures.

The Petitioner admitted that trial counsel had provided him with questions and answers to prepare for trial and that counsel gave him "homework" to assist in his preparation, but the Petitioner still maintained that he was not properly prepared for trial. Instead, the Petitioner believed that trial counsel "properly coerced" him to give certain answers.

The Petitioner believed that trial counsel should have retained an expert witness to testify about the procedure for performing CPR on a child. The Petitioner also wished that trial counsel had introduced into evidence videos and photographs to give the jury a sense of "how seizure behavior looks, appears, before, after, during."

According to the Petitioner, the victim had "marks" on his body prior to the day of his death, and the victim's mother was aware of these bruises or abrasions, but this information was never presented to the jury. The Petitioner expressed to trial counsel that he wished to pursue a defense theory that the victim's fall during the seizure caused all of the victim's injuries, but the Petitioner "didn't have a part" in deciding his defense strategy.

On cross-examination, the Petitioner conceded that trial counsel had properly prepared him for trial but that he simply disagreed with the defense strategy chosen by trial counsel.

Following the hearing, the post-conviction court entered an order denying the Petitioner's post-conviction petition, finding that trial counsel's tactical decisions "were soundly made and supported" and that the Petitioner had failed to establish prejudice. This appeal followed.

## ANALYSIS

The Petitioner contends that trial counsel provided ineffective assistance by failing to call an expert witness on the issue of the Petitioner's epilepsy, to present character

witnesses and witnesses to the Petitioner's prior seizure activity, and to prepare him for trial.

To be granted post-conviction relief, a petitioner must establish that his conviction or sentence is void or voidable due to the abridgment of any constitutional right. T.C.A. § 40-30-103. The petitioner has the burden of proving the allegations of fact by clear and convincing evidence. *Id.* § 40-30-110(f); *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)). Factual findings by the post-conviction court are conclusive on appeal unless the evidence preponderates against them. *Ward v. State*, 315 S.W.3d 461, 465 (Tenn. 2010). This court may not substitute its inferences for those drawn by the trial judge, and "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved by the trial judge." *Henley v. State*, 960 S.W.2d 572, 579 (Tenn. 1997). Claims of ineffective assistance of counsel in post-conviction petitions are regarded as mixed questions of law and fact. *Grindstaff*, 297 S.W.3d at 216. Thus, our review is de novo with no presumption of correctness. *Pylant v. State*, 263 S.W.3d 854, 867-68 (Tenn. 2008) (citing *Finch v. State*, 226 S.W.3d 307, 315 (Tenn. 2007)).

The Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the accused the right to effective assistance of counsel. To prevail on a claim for ineffective assistance, a petitioner must prove "that counsel's performance was deficient and that the deficiency prejudiced the defense." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996) (citing *Strickland v. Washington*, 466 U.S. 668, 687 (1984)).

To demonstrate deficiency, a petitioner must show "'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Felts v. State*, 354 S.W.3d 266, 276 (Tenn. 2011) (quoting *Strickland*, 466 U.S. at 687). A petitioner "'must show that counsel's representation fell below an objective standard of reasonableness' guided by 'professional norms' prevailing at the time of trial." *Id.* (quoting *Strickland*, 466 U.S. at 688) (internal quotations omitted). On review, counsel's performance is not to be measured by "20-20 hindsight." *Id.* at 277. Instead, there is a "strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* (citing *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999)). The court must presume that counsel's acts might be "'sound trial strategy,'" and strategic decisions are "'virtually unchangeable'" when made after a thorough investigation. *Id.* (quoting *Strickland*, 466 U.S. at 689).

To establish prejudice, "a petitioner must establish 'a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different.'" *Id.* (quoting *Strickland*, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* A petitioner must show that counsel's performance was so deficient that it deprived the petitioner "of a fair trial and called into question the reliability of the outcome." *Finch*, 226 S.W.3d at 316 (citing *Burns*, 6 S.W.3d at 463). "Failure to establish either deficient performance or prejudice necessarily precludes relief." *Felts*, 354 S.W.3d at 276.

## I.  Epilepsy Expert

The Petitioner argues that trial counsel provided ineffective assistance by failing to call an expert witness on the issue of the Petitioner's epilepsy. He argues that an expert neurologist could have corroborated the Petitioner's testimony concerning the events surrounding his seizure and the ways in which the seizure and subsequent ingestion of medication would have affected the Petitioner's memory and state of mind.

Trial counsel testified that he had sought the services of a neuropsychologist but that the trial court had denied his request for funding. Counsel stated that it would have been unreasonable to attempt to convince a jury that the victim's fall during the Petitioner's seizure had caused all of his injuries, and proof of the injuries being caused by the fall would have conflicted with Dr. Young's testimony that the injuries had primarily been caused by resuscitative efforts. The post-conviction court found that trial counsel "made a tactical decision not to develop an alternate theory because the alternate theory would have been contrary to [the Petitioner's] statements to police."

When a claim of ineffective assistance of counsel is premised on counsel's failure to interview or call witnesses, the witnesses must be presented at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990). "'As a general rule, this is the only way the petitioner can establish that … the failure to have a known witness present or call the witness to the stand resulted in the denial of critical evidence which inured to the prejudice of the petitioner.'" *Pylant*, 263 S.W.3d at 869 (quoting *Black*, 794 S.W.2d at 757). This is because the court cannot speculate as to what a witness's testimony might have been. *Black*, 794 S.W.2d at 757. Presenting the witness allows the post-conviction court to determine whether that witness's testimony would have been credible, material, and admissible. *Black*, 794 S.W.2d at 757.

The Petitioner has failed to demonstrate that he was prejudiced when trial counsel did not use an expert on the issue of the Petitioner's epilepsy because the Petitioner did not present such an expert to testify at the post-conviction hearing. Moreover, trial counsel attempted to secure such a witness and accordingly did not perform deficiently.

We conclude that the post-conviction court's finding that counsel's decision not to call an epilepsy expert was sound trial strategy is also supported by the record.

## II. Character and Epilepsy Witnesses

The Petitioner next asserts that trial counsel should have called both character witnesses to address the Petitioner's non-violent disposition and witnesses who had observed the Petitioner's epileptic seizures to discuss the effects of the Petitioner's seizures. With respect to character witnesses, trial counsel explained that his primary concern was that any evidence of the Petitioner's character for peacefulness and non-violence could have opened the door for the State to address prior bad acts. The post-conviction court accredited trial counsel's testimony on this matter and held that trial counsel made this sound tactical decision after adequate trial preparation. Regarding the Petitioner's desire for witnesses to testify about having observed his prior seizures and their effects, trial counsel explained that such testimony would not only have been cumulative but would have detracted from their theory that the victim's injuries were caused by the resuscitative efforts. We conclude that trial counsel was not deficient in failing to call any of these witnesses. As these witnesses were not presented at the post-conviction hearing, the Petitioner has also failed to establish prejudice. *See Black*, 794 S.W.2d at 757.

## III. Failure to Prepare for Trial

Finally, the Petitioner contends that trial counsel failed to adequately prepare him for trial. Specifically, the Petitioner claims that trial counsel spent "little time" in "actual preparation for" the Petitioner's trial testimony and that the Petitioner was "coerced" into answering questions at trial in such a way as to coincide with trial counsel's defense theory. The post-conviction court, in addressing the Petitioner's claim that trial counsel did not adequately prepare for trial, found that "[n]othing could be further from the truth," accrediting trial counsel's testimony that he spent "hundreds of hours" in trial preparation and "almost 40" hours preparing the Petitioner for his testimony. On cross-examination, the Petitioner even admitted that counsel had properly prepared him for trial but that he simply disagreed with counsel's defense strategy. The Petitioner has failed to show that trial counsel's performance was deficient or prejudicial in this regard.

The Petitioner raises, for the first time on appeal, a claim that trial counsel should have arranged a meeting between the Petitioner and Dr. Young. The Petitioner has waived our consideration of this issue by failing to present it to the post-conviction court. *See Butler v. State*, 789 S.W.2d 898, 902 (Tenn. 1990); *see also Johnny O. Clark v. State*, No. W2001-02856-CCA-R3-PC, 2002 WL 1841630, at *7 (Tenn. Crim. App. Aug. 8,

2002) ("Issues not presented in a post-conviction petition and raised for the first time on appeal are waived." (citation omitted)).

## CONCLUSION

Based on the foregoing, we affirm the post-conviction court's denial of the Petitioner's post-conviction petition.

_____
JOHN EVERETT WILLIAMS, JUDGE